UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MARC SMITH,  )
618 Powhatan Place, NW  )
Washington, D.C.  20011,  )  Judge _____
 )  Civil Action No. _____
 )
 PLAINTIFF  )
 vs.  )
 )
UNITED STATES,  )
 )
 )
 DEFENDANT  )
 )

# COMPLAINT

## THE PARTIES

1. Plaintiff Marc Smith is a citizen of the District of Columbia residing at 618 Powhatan Place N.W., Washington D.C. 20011.

2. The United States Marshals Service ("USMS") is a component of the Department of Justice, which is an agency of Defendant United States.

## JURISDICTION AND VENUE

3. This action arises under the Federal Tort Claims Act, 28 USC § 1346(b).

4. This Court has jurisdiction over the parties and subject matter pursuant to 28 USC §§ 1331 and 1346(b).

5. Venue is proper in this district pursuant to 28 USC § 1402(b) because the events or omissions giving rise to this action occurred in the District of Columbia.

## STATEMENT OF FACTS

6.At all times relevant to this complaint, Plaintiff was a member of Occupy Our Homes. ("OOH")  OOH was an affiliate group of Occupy D.C., which was part of the larger Occupy movement.  OOH is and was devoted to stopping illegal foreclosures and evictions.

7.On June 6, 2012, deputies of the USMS came to 917 Maryland Avenue, N.E. to evict Dawn Butler and her daughter from the Butler home.  Ms. Butler had lived at 917 Maryland Ave., N.E. for six years.  Ms. Butler had invited members of OOH to stage a protest to delay the eviction while she went to court to appeal the eviction order.  Several members of the Butler family participated in the protest.

8.On April 2, 2012, an OOH protest had delayed a previous eviction attempt long enough for Ms. Butler to secure a stay from the D.C. Landlord/Tenant Court preventing the illegal eviction.

9.OOH's June 6, 2012 protest ("the Protest") was planned to be, and was, peaceful in all respects.

10.The Protest began early on the morning of June 6.  There were between 30-40 protesters.  Many of the protesters were chanting and carrying signs protesting illegal foreclosures and evictions.

11.The Butler home has two entrances.  The main door opens onto a staircase leading to the front yard ("main door staircase").  On the day of the Protest, the main door was blocked by milk crates, which were glued together and reinforced with plastic ties.

12.There was a second staircase next to the main door staircase, which led downwards to a small landing and a second door ("the downstairs door").  The downstairs door was protected by a security gate, which opened independently of the

door. The security gate was metal, with bars running from top to bottom and space in between the bars.

13. On the morning of the protest, Mr. Smith and another protester, Richard Lehner, III, were seated on opposite sides of the security gate connected by a "sleeping dragon," which passed between the bars of the security gate. The security gate was closed. Mr. Smith was seated outside the house on the landing and Mr. Lehner was inside the house.

14. A sleeping dragon is a device consisting of a length of PVC piping, into which two or more protesters place their arms. Some variations of sleeping dragons involve using chicken wire, duct tape, tar, and/or concrete to make it difficult to break and remove. Inside the pipe, handcuffs or other means are used to bind the individuals' hands together.

15. Sleeping dragons are used by protesters to create a human obstacle.

16. Sleeping dragons have been in widespread use in the United States for more than fourteen years, notably at the 1999 World Trade Organization protests in Seattle, 2010 immigration protests in Los Angeles, and Occupy protests all over the country, as well as hundreds of other protests in the United States. The nature and uses of sleeping dragons are widely known to the public and to law enforcement. Law enforcement agencies around the country, including the District of Columbia Metropolitan Police Department and the Federal Bureau of Investigation, provide training to their officers in how to remove protesters from sleeping dragons.

17. Sleeping dragons of the type used by Plaintiff have frequently and safely been used by protesters without injury.

18. Mr. Smith's wrist was connected to a carabineer in the center of the sleeping dragon by a piece of cable. One end of the cable was tied in a knot around Mr.

Smith's wrist and the other end was tied to the carabineer. The particular knot used was chosen because whenever Mr. Smith's arm was pulled away from the carabineer, the knot would tighten. Mr. Lehner's wrist was tied to the carabineer with a similar knot. When either protester was pulled, the knots around both protesters' wrists tightened. The sleeping dragon used by Plaintiff did not contain chicken wire, duct tape, tar, concrete, or any other substances that would have made it difficult to safely break and remove using techniques well-known to law enforcement.

19. Any reasonable standard of care for safely extracting protesters from a sleeping dragon would involve cutting through the PVC pipe. It is a violation of the standard of care to attempt to extract protesters from a sleeping dragon by trying to simply pull them out.

20. Deputy U.S. Marshals owed a duty of care to not create an unreasonable risk of injury to members of the public in performing their law enforcement function.

21. The USMS arrived to evict Ms. Butler's family at around 9:30 AM. There were between 15-25 deputy U.S. Marshals.

22. An African-American deputy marshal ("the first DUSM"), whose identity is presently unknown to Plaintiff, came down the stairs to the landing where Mr. Smith was seated. The first DUSM tugged on Mr. Smith and, when Mr. Smith did not come loose, asked, "Are y'all bound together?" Mr. Smith confirmed that he and Mr. Lehner were bound together. The DUSM went back up the stairs.

23. After the DUSMs had cleared the main door of the house, a second deputy marshal ("the second DUSM") came down the stairs. The second DUSM, whose identity is presently unknown to Plaintiff, appeared to be over six feet tall, white, well-muscled, and had a military-style haircut.

24. The second DUSM said, "Let's go," and placed his hands around Mr. Smith's neck. The second DUSM then pulled Mr. Smith upwards. Mr. Smith shouted, "We're bound together." The second DUSM continued to pull on Mr. Smith's neck, causing Mr. Smith pain and inhibiting Mr. Smith's breathing.

25. The second DUSM continued to try to pull Mr. Smith out of the sleeping dragon, holding Mr. Smith upright by the neck. While Mr. Smith was upright, the DUSM continued to try to extract him from the sleeping dragon by pulling on his neck. The DUSM then pulled Mr. Smith off his feet to his knees. Neither the second DUSM, nor any other employee of the U.S. Marshals service, attempted to use any of the techniques well-known to law enforcement for safely disassembling a sleeping dragon without harming the participants.

26. Throughout the incident, the second DUSM attempted to see the connecting device inside the sleeping dragon, and therefore likely had additional confirmation that the participants were bound together and could not safely be extracted by simply pulling them.

27. The second DUSM grabbed Mr. Smith's left arm, placed his knee on Mr. Smith's face, and continued to pull. This continued for around 3-4 minutes. Mr. Smith's face was trapped between the second DUSM's knee and the concrete wall and floor. The second DUSM knew this would not get Mr. Smith out of the sleeping dragon. Mr. Smith could not breathe and continuously tried to tell the second DUSM that he could not breathe. The second DUSM was screaming at Mr. Smith and Mr. Lehner, ordering them to take their arms out of the sleeping dragon.

28. The first DUSM informed the second DUSM that Mr. Smith and Mr. Lehner were bound together. The second DUSM stated, "They got themselves into this, they can get themselves out." Even if the second DUSM had not known he could not

extract Mr. Smith and Mr. Lehner by force from the sleeping dragon prior to the first DUSM's statement, the second DUSM knew force would not work after the statement.

29. The second DUSM then put his hands back around Mr. Smith's neck and pulled him to his feet again. The second DUSM was deliberately hurting Mr. Smith in an attempt to cause Mr. Smith to voluntarily remove his arm.

30. The second DUSM continued to drag Mr. Smith to his feet and then throw him back to the concrete. The second DUSM repeated this several times, until Mr. Smith finally lost consciousness. At some point during his attempts to force Mr. Smith out of the sleeping dragon, the second DUSM broke the orbital bone under Mr. Smith's left eye. When Mr. Smith lost consciousness he was still tied inside the sleeping dragon. Mr. Smith was extracted from the sleeping dragon while he was unconscious.

31. Mr. Smith did not know or expect that the type of injuries he suffered were the types of injuries that could be suffered by a person being removed from a sleeping dragon.

32. Mr. Smith would have been unable to release himself from the sleeping dragon in the amount of time the second DUSM demanded that he do so.

33. The DUSMs carried Mr. Smith up the stairs and threw him on the sidewalk, where other protesters cared for him until EMTs arrived.

34. Mr. Smith was unconscious for around 20 minutes. Mr. Smith's injuries included, but were not limited, to abrasions, scratches, linear fracture of the floor of the left orbital socket, thoracic spine tenderness, mental distress, and pain.

35. Mr. Smith was taken to Howard University Hospital, where he received medical care.

36. Since June 6, 2012, Mr. Smith has suffered from headaches, impaired vision, back problems, scarring and other physical and psychological injuries.

## COUNT I:
## FEDERAL TORT CLAIMS ACT
(Defendant United States)

37. This Count re-alleges and incorporates by reference each of the preceding paragraphs.

38. The United States is liable for the tortious conduct of its employees pursuant to the Federal Tort Claims Act.

39. Assault and Battery: Unknown U.S. Marshal Service Employee (referred to above as Second DUSM) used force against Mr. Smith in an attempt to force him to abandon his protest and remove his arm from the sleeping dragon.  The force used was excessive and no reasonable police officer would have used that amount of force.  The actions of the second DUSM were not intended to serve any legitimate law enforcement purpose, but simply to cause injury to Plaintiff.  The actions that formed the basis for this count include Second DUSM lifting and dropping Mr. Smith repeatedly, Second DUSM placing his knee on Mr. Smith's face, pushing Mr. Smith's face into the wall and ground, and choking and pulling Mr. Smith by the neck repeatedly until Mr. Smith's head was bleeding and he lost consciousness.  Alternatively, if Second DUSM's actions were intended to be a pain compliance technique, the actions taken, and force used, were excessive and beyond what any reasonable police officer would have done.

40. Negligence: Unknown U.S. Marshals Service Employee (second DUSM) was negligent in that he did not use any of the techniques well-known to law enforcement for safely disassembling a sleeping dragon without harming the participants.  Instead the Second DUSM negligently attempted to remove Mr. Smith from the sleeping dragon by merely pulling Mr. Smith, even though he had no reason to believe that would safely extract Mr. Smith from the sleeping dragon.

41. The events giving rise to this lawsuit occurred on June 6, 2012.  The Federal Tort Claims Act requires a claim to be presented to the agency within two years after such claim accrues.  On May 20, 2013, Mr. Smith mailed an administrative tort claim, for injuries arising out of the June 6, 2012 incident, to the U.S. Marshals Service.  In a letter dated May 28, 2013, the USMS acknowledged receipt of Mr. Smith's letter.  On September 9, 2013 the U.S. Marshals Service denied Mr. Smith's administrative claim.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

(1) Award Plaintiff compensatory damages in an amount to be determined at trial;

(2) Award Plaintiff litigation costs reasonably incurred in this action;

(3) Grant Plaintiff such other and further relief which the Court deems proper.

Respectfully Submitted,

  /s/ Jeffrey Light

Jeffrey L. Light
D.C. Bar #485360
1712 Eye St., NW
Suite 915
Washington , DC 20006
(202)277-6213
Jeffrey.Light@yahoo.com

*Counsel for Plaintiff*